

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-6-2003

# Brooks v. Amer Centennial Ins

Precedential or Non-Precedential: Precedential

Docket 00-4277

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Brooks v. Amer Centennial Ins" (2003). *2003 Decisions*. Paper 518.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/518

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed May 6, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-4277

DENNIS J. BROOKS,

Appellant

v.

AMERICAN CENTENNIAL INSURANCE COMPANY,
A CORPORATION

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civ. No. 97-cv-02083)
District Judge: Honorable Donald J. Lee

Argued: September 18, 2002

Before: BECKER, *Chief Judge*,* SCIRICA**
and McKEE, *Circuit Judges.*

(Filed May 6, 2003)

JOSEPH LEIBOWICZ, Esq. (Argued)
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312

*Counsel for Appellant
Dennis J. Brooks*

* Judge Becker's term as Chief Judge ended on May 4, 2003.

** Judge Scirica became Chief Judge on May 4, 2003.

E. GRAHAM ROBB (Argued)
MICHAEL S. SAVETT
Weber Goldstein Greenberg &
 Gallagher LLP
2 Gateway Center, Suite 1450
603 Stanwix Street
Pittsburgh, PA 15222

*Counsel for Appellee*
*American Centennial Insurance*
*Company*

---

## OPINION OF THE COURT

---

BECKER, *Chief Judge*.

In this insurance coverage dispute, plaintiff Dennis Brooks seeks coverage from defendant American Centennial Insurance Company ("ACI") for an injury he suffered while loading heavy machinery onto a truck owned by Eazor Express, for which ACI provided excess insurance coverage. Although Brooks suffered his injury in 1981, his case alleging negligence against Eazor, which he brought in the Court of Common Pleas of Allegheny County, Pennsylvania, did not go to trial until 1993. By that time, Eazor had ceased to exist. Brooks therefore sought recovery from ACI pursuant to Pennsylvania's Direct Action statute, which allows him to "stand in the shoes" of Eazor to assert against ACI any claim which Eazor could have asserted. Due to an odd combination of circumstances, no defense was offered at Brooks's trial, where he won a judgment of $5,979,482.80. While $1 million was the responsibility of (and was paid by) lower-level carriers, the balance was payable by ACI.

ACI refused to pay, however, arguing that its policy conditioned coverage upon prompt notice of any impending claim, and representing that it first learned of Brooks's suit in July of 1996, fully three years after Brooks won his verdict. It offered as evidence the testimony of Luann Petrellis, a corporate representative who worked in ACI's claims department. She testified that ACI's records showed

no notice of Brooks's claim prior to 1996, and that ACI had no third-party agents authorized to receive notice of claims on ACI's behalf. The District Court granted summary judgment to ACI, finding that Brooks had failed to produce any evidence to counter Petrellis's testimony, and that Brooks's late notice had prejudiced ACI.

Although we agree that ACI was prejudiced when no defense was presented at trial, we conclude that the District Court erred in holding, on summary judgment, that ACI did not receive timely notice of Brooks's claim. Although Petrellis stated that ACI's records reflected no timely notice from Brooks, she based her opinion on her review of Eazor's underwriting files, which ACI obtained from The Underwriters, Inc. ("TUI"). TUI, at times relevant, acted as ACI's "managing agent." The record suggests that TUI had been in close communication with Darrah (the company that assembled Eazor's insurance package) and North Star (a lower-level insurer), both of which knew of Brooks's claim. Pursuant to the controlling decision in *Brakeman v. Potomac Ins. Co.*, 371 A.2d 193 (Pa. 1977), ACI bears the burden of proving that TUI's files did not alert it to Brooks's claim. We conclude that ACI cannot carry that burden, as exemplified by the fact that Petrellis admitted at trial that "there at one time may have been a much more extensive [TUI] file. I don't know. . . . Things could have been moved. Ultimately, what we got is what we got." (A241-42.) Viewing the evidence, more fully discussed *infra*, in the light most favorable to Brooks, we are satisfied that a reasonable person could conclude that Petrellis failed to review all of TUI's documents, some of which might have reflected notice of Brooks's claim. We will therefore reverse the District Court's grant of summary judgment, and remand for further proceedings.

## I. Facts and Procedural History

Eazor Express ("Eazor") was a trucking company headquartered in Pittsburgh, Pennsylvania. On July 28, 1981, Brooks, an employee of Gulf Oil Corp., was one of several men loading heavy industrial field pumps onto an Eazor truck. Although Brooks initially used a forklift to hoist the pumps onto the truck and to push them toward

the front of the trailer, that method caused cracking in the wooden pallets under the pumps. Ben Palmer, Brooks's supervisor, therefore instructed Brooks and several of his co-workers to lift and slide the pumps manually. Brooks and two others succeeded in moving two 600-pound pumps, but when they attempted to move an 850-pound pump, the pump slid off the hand cart and fell over, pushing the hand cart into Brooks's stomach and throwing him against the wall of the trailer. Brooks has been disabled since the date of the accident. Numerous treating physicians, as well as physicians who examined him in connection with his receipt of workers' compensation benefits and Social Security total disability benefits, have confirmed that condition.

At the time of Brooks's accident, which he alleged to be the result of Eazor's negligence, Eazor maintained multi-layered general liability coverage for personal injury claims. The first layer was a self-insured retention ("SIR") of $150,000 per claim. Lloyd's of London provided coverage for claims between $150,000 and $350,000. North Star Reinsurance Corporation ("North Star") provided the next layer of coverage, which protected against claims ranging from $350,000 to $1 million. (A283.) Eazor's final layer of coverage, which was provided by ACI, is the policy at issue in the case at bar. It covered claims ranging from $1 million to $5 million. Since Interstate Commerce Commission trucking regulations required Eazor to maintain self-insurance for claims up to $100,000, Eazor arranged for an insurance certificate to be issued by Guarantee Insurance Company ("Guarantee"). (A388.) Under that arrangement, Eazor paid premiums to North Star, which in turn agreed to hold Guarantee harmless for any claim made pursuant to the certificate. (A456.)

In 1984, Eazor's creditors filed a petition for its liquidation in the United States Bankruptcy Court for the Western District of Pennsylvania. Eazor ceased operations in 1985, and its bankruptcy case was closed in 1991. Although Brooks filed his Complaint against Eazor and Goulds (the pump manufacturer) in 1983, fully a year before Eazor declared bankruptcy, his case did not proceed to trial until May of 1993; during the intervening decade,

the litigation was rife with delay, miscommunication, and confusion. Brooks submits that, because of his back injury and ongoing pain arising therefrom, he has been unable to return to his job at Gulf and cannot hold any other job that involves heavy lifting or other manual labor. (A732.) Indeed, as of 1993, he contended that it was nearly impossible for him to do regular household chores, and that his injury had played a role in the deterioration of his marriage. (A729.)

Brooks brought suit by Praecipe for Writ of Summons in the Court of Common Pleas of Allegheny County, Pennsylvania, against Eazor and Goulds. Against Eazor, Brooks alleged negligence in maintaining the interior of the trailer into which he was loading pumps at the time of his injury. As to Goulds, the pump manufacturer, he claimed that the pallets on which the pumps rested were structurally inadequate, and that Goulds negligently failed to warn him of the dangerous condition. (A852, 856.) Eazor initially retained attorney James Elder to defend it, but once Eazor entered into bankruptcy and ceased operations, it apparently stopped paying Elder's fees and Elder sought to withdraw from the case. (A865.) He withdrew in 1989, and during the pendency of Eazor's bankruptcy, there seems to have been little activity concerning Brooks's claim.

Following the conclusion of the bankruptcy proceedings in 1991, Brooks began to pursue his claim more actively. In 1992, Guarantee Insurance, in coordination with North Star, retained Robert Weinheimer as counsel for the defunct Eazor. Weinheimer obtained an extension of a September 1992 trial date and received the court's permission to reopen discovery. However, as Guarantee was trying to settle the matter and wished to minimize its legal costs, it instructed Weinheimer not to defend actively against Eazor's claim. (A687-690.) Thus, no answer was ever filed, and no discovery was pursued — indeed, neither Goulds nor Eazor so much as obtained an independent examination of Brooks's medical condition.

In 1991, Goulds filed a pre-trial statement in which it indicated that (unlike Eazor) it was prepared to challenge Brooks's claims concerning liability and damages. (A836.) Shortly thereafter, Brooks agreed to dismiss Goulds from

the case. (A846-47.) At the same time, Brooks settled with Guarantee Insurance for $100,000, the limit of Guarantee's responsibility under the ICC filings it made on Eazor's behalf. These dismissals left Eazor as the sole defendant, and as stated *supra*, Eazor's attorney had been instructed not to defend the case actively. The end result was that no defense was offered at trial — no contrary medical evidence was presented, no vocational expert testimony was proffered to demonstrate that Brooks could hold a job different from the one he held at Gulf, and no argument was made that Brooks was contributorily negligent or that he assumed the risk of his injuries. Brooks adduced evidence of damages for medical treatment and past wage loss in excess of $350,000, and of future wage loss alleged to be in excess of $4 million. He told the court that he believed his entire claim to be worth $10 million. After hearing a little more than one hour of evidence from Brooks and his counsel, the court held in favor of Brooks and awarded him $3 million in compensatory damages and $2,979,492.80 in punitive damages, for a total judgment of $5,979,482.80. (A881-87.)

More than three years later, in July of 1996, Brooks's counsel wrote to ACI, advising it of the May 1993 verdict and demanding that it pay $4 million in satisfaction of that judgment. ACI responded that it had never heard of Brooks, and had no notice or knowledge of his claim against Eazor, his lawsuit, or the May 1993 trial and verdict. ACI's policy required that it be given notice "[u]pon the happening of an occurrence *reasonably likely* to involve" ACI, (A302) (emphasis added), and provided that ACI "shall have the right and opportunity to associate with the insured in the defense and control of any claim or proceeding reasonably likely to involve" its coverage layer. (*Id.*) ACI argued that, under Pennsylvania law, an insurer is relieved of any obligation to indemnify its insured for a claim where the insured fails to provide timely notice of its claim and the insurer suffers prejudice as a result, citing to *Brakeman v. Potomac Ins. Co.*, 371 A.2d 193 (Pa. 1977). It submitted that it had been prejudiced insofar as no one had conducted an independent medical examination of Brooks or even presented a defense at trial, and it therefore denied Brooks's claim.

Brooks brought the present declaratory judgment action against ACI in the District Court for the Western District of Pennsylvania, asking the Court to declare ACI liable for the amount of Brooks's recovery exceeding $1 million. ACI moved for summary judgment, claiming lack of notice pursuant to *Brakeman*. Brooks argued that he had provided clear notice to Darrah (the firm that had assembled Eazor's insurance package, and that had audited ACI's books in 1982) and North Star, and that their close association with ACI made it likely that ACI too had learned of his claim. Brooks also submitted that ACI's policy, which provided for notice to ACI "or any of its authorized agents," implied the existence of such agents, and that Brooks had no reason to presume Darrah was not an agent insofar as it conducted audits of ACI's clients. The District Court granted ACI's motion for summary judgment. It concluded that Brooks's arguments that ACI might have received notice were "predicated upon speculation," and stated that such "purely theoretical" assertions are "insufficient to defeat summary judgment." Brooks now appeals from this judgment. The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), and we exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## II.  Discussion

Under Pennsylvania's Direct Action Statute, Pa. Stat. Ann. tit. 40, § 117 (West 1993), Brooks stands in the shoes of Eazor, the bankrupt insured, for purposes of seeking recovery from an insurer. Brooks's right to a recovery from ACI is therefore coextensive with Eazor's right, had Eazor survived to assert it. To the extent ACI could successfully assert a defense of lack of notice against Eazor, it may also assert such defense against Brooks. The governing law on ACI's notice defense is set forth in *Brakeman*, 371 A.2d at 198: "[W]here an insurance company seeks to be relieved of its obligations under a liability insurance policy on the ground of late notice, the insurance company will be required to prove that the notice provision was in fact breached and that the breach resulted in prejudice to its position."

We are satisfied that ACI was prejudiced by its absence from Brooks's trial, for as mentioned *supra*, no real defense was offered. Indeed, ACI alleges nine ways in which it was prejudiced, including that it was unable to: (1) investigate the claim prior to trial; (2) interview witnesses or retain counsel; (3) present several defenses to its liability, including contributory or comparative negligence, assumption of risk and contribution or indemnification by a third party tortfeasor (Goulds); (4) obtain an independent medical examination of Brooks; (5) present any defense as to damages; (6) engage in discovery concerning Brooks's alleged injuries and present its own medical experts at trial; (7) retain a vocational expert and present other available evidence that Brooks was capable of holding a job; (8) engage in settlement negotiations; and (9) appeal the $6 million, unchallenged verdict.

The harder question is whether ACI met its *Brakeman* burden of proving that the notice provision was in fact breached. Because the District Court granted summary judgment for ACI on its lack-of-notice argument, we may affirm only if we conclude that a reasonable person, viewing the evidence in the light most favorable to Brooks, could not conclude that ACI received notice of Brooks's claim, and that it received it in time to avoid prejudice. If a reasonable person *could* conclude that ACI received timely notice, summary judgment was inappropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The parties agree that, at the time of trial, Brooks believed his claim was worth $10 million, an amount that unambiguously implicated ACI's coverage layer. Indeed, because Brooks was injured in 1981 and filed his complaint in 1991, and claimed lost past and future earnings of approximately $4 million as well as longstanding pain and suffering, he was surely aware of the magnitude of his claim long before the trial itself. Brooks, however, contends that he owed no notice to ACI, for ACI's contract calls for the *insured*, i.e. Eazor, to notify the insurer when the insured expects a claim to impact the insurer's coverage layer. He represents that, although Pennsylvania's direct action statute allows Brooks to stand in Eazor's shoes for the purposes of pursuing an insurance claim, that statute

does not shift to Brooks the burden of notifying ACI. We find that argument untenable for two reasons. First, Eazor ceased to exist in 1991, two years before Brooks's claim went to trial; if the duty to notify ACI remained with Eazor even after its dissolution, ACI's notice provision would be a dead letter, a result that is illogical in light of the fact that ACI is a *de facto* defendant on Brooks's claim.

The more serious problem with Brooks's argument, however, is that Eazor's contract with ACI guaranteed ACI a right to associate with Eazor in defending against any claim that might impact its coverage layer. ACI alleges that its late receipt of notice violated its contractual right to associate with the defense, and that under Pennsylvania's direct action statute, ACI may assert against Brooks any claim that it might otherwise have asserted against Eazor. Put differently, even if the direct action statute does not shift to Brooks the duty to notify ACI, it nonetheless allows ACI to assert lack of notice against Brooks, assuming (of course) that ACI can prove such under *Brakeman*.

Having concluded that ACI's coverage is contingent upon timely notice from Brooks, the question is whether ACI can demonstrate, pursuant to *Brakeman*, that it did not receive notice of Brooks's claim a reasonable time before the May 1993 trial. ACI offered as proof the testimony of Luann Petrellis, the Senior Vice President and Manager of ACI's claims department. In her deposition, she stated that Brooks's July 1996 letter was the first notice received by ACI concerning his claim. (A114.) She formulated that opinion after checking the underwriting file obtained from TUI, ACI's managing general agent, which contained no evidence of any claim.[1] She also checked ACI's computer system, which reflected no notice prior to that received in July of 1996. (A1012, 1015.) Finally, Petrellis testified that while Darrah and North Star might have learned of Brooks's claim in timely fashion, neither was an authorized agent of ACI; indeed, Petrellis submits that ACI never had

---

1. Both Brooks and ACI describe TUI as ACI's "managing general agent." (Brooks Br. at 9; ACI Br. at 30-31). Neither party, however, explains the function of a managing general agent nor distinguishes it from any other type of agent.

an agent authorized to accept notice of claims. (A231, 240, 242-43.)

Brooks offers several responses. First, he submits that Petrellis's testimony is inadmissible for summary judgment purposes, for she allegedly had no first-hand knowledge of ACI's policies during the time in question. Petrellis joined ACI in 1992, at which point she assumed responsibility for its claims department. (A225.) ACI, however, had stopped writing excess insurance policies in 1985, and it had been in "run off" for seven years when Petrellis joined the company. (A225-26.) The result was that Petrellis knew little about such policies and the procedures ACI employed regarding them. For example, her testimony reveals that she did not know whether ACI had a practice of obtaining copies of underlying insurance policies, (A227), nor did she know whether ACI had any mechanism for communicating with underlying insurers and confirming the status of their policies. (A229.) Brooks also submits that the records Petrellis consulted were too incomplete to support her statement that ACI never received notice. For example, although she states that she consulted TUI's underwriting file, she admitted upon questioning that ACI had difficulty getting TUI's documents:

> There at one time may have been a much more extensive file. I don't know. I produced to you what we had, everything that was left. For many years, these files were warehoused somewhere in north New Jersey. I don't know if it was under lock and key. Things could have been moved. Ultimately, what we got is what we got.

(A241-42.) Brooks contends that potentially incomplete records cannot successfully support a motion for summary judgment on the basis of lack of notice.

Second, Brooks argues that even if ACI did not actually employ Darrah or North Star as agents, his notice to them likely alerted ACI to his suit, for Darrah and North Star worked closely with Eazor — Darrah had assembled Eazor's insurance package (including ACI's coverage) in the first instance, and Petrellis testified that ACI depended on North Star to defend against lower-level claims "appropriately and

professionally." (A238.) The record suggests that North Star and Darrah spoke frequently with TUI regarding Eazor, (A240), and Petrellis testified that it was possible that someone at ACI had communicated with North Star to determine whether there were any pending claims. (*Id.*) Brooks reasons that, as ACI bears the burden of proving lack of notice, it must disprove the possibility that one of its case managers had received notice from a lower-level carrier.

Finally, Brooks points out that ACI's policy allows for notice to be served upon "the company or any of its authorized agents," and suggests that this language "unambiguously implies the existence of authorized agents." (Blue Br. at 32.) Brooks argues that, given the close working relationship among Eazor, Darrah, and North Star, he cannot be blamed for believing that Darrah and North Star were ACI's agents. When viewed against the backdrop of the plan's allusion to unnamed agents, Brooks submits, it was natural to assume that ACI's intimate relationship with Darrah and North Star implied a degree of agency. For support, he cites to *St. Paul Fire & Marine Ins. Co. v. United States Fire Insurance Co.*, 655 F.2d 521 (3d Cir. 1981), which also involved a policy providing for notice to "the company or any of its authorized agents." There, the insured had received a complaint and "turned it over to his insurance agent," *id.* at 525, but the insurer argued that notice was improper because the agent was not authorized to receive notice. The burden to prove lack of notice was on the insurer, however, and there was no evidence in the record that the agent was not authorized to receive notice. We therefore concluded that service upon the agent was sufficient to invoke coverage. Brooks submits that *St. Paul Fire* is materially indistinguishable from the case at bar, and that we should likewise conclude that notice to Darrah and North Star constituted notice to ACI.

We are troubled by ACI's misleading contractual reference to "other authorized agents" that it apparently never had, especially given its intimate relationship with companies that might look like agents to an insured. But we need not determine whether Darrah and North Star were ACI's agents under the reasoning set forth in *St. Paul*

*Fire*, for we conclude that we must set aside the grant of summary judgment because ACI may have received notice of Brooks's claim through TUI, its underwriter. As explained *supra*, the record suggests that North Star and Darrah spoke frequently with TUI regarding Eazor, (A240), and it is clear that both North Star and Darrah were aware of Brooks's claim. (A470-71) (letter to J. Majsak from G. Cunningham, 5/23/85). It is entirely possible that TUI learned of Brooks's claim over the course of that communication. Because *Brakeman* places on ACI the burden of proving lack of notice, ACI may prevail on summary judgment only if, taking the evidence in the light most favorable to Brooks, no reasonable person could infer that ACI received notice of Brooks's claim through TUI.

ACI's evidence is insufficient to rule out that possibility. When TUI dissolved in the mid-1980s, ACI requested all of its documents relating to Eazor, documents which might have included information relating to Brooks's claim. Indeed, Petrellis reviewed at least some of these TUI documents, and she relied upon them in reaching her conclusion that ACI had received no notice of Brooks's claim prior to 1996. (A1012, 1015.) But Petrellis could not state with certainty that she had reviewed all of the documents ACI had received from TUI — she stated that "there at one time may have been a much more extensive file. I don't know. . . . Things could have been moved. Ultimately, what we got is what we got." (A241-42.) Summary judgment is improper in the face of such uncertainty, for we are required to assume that Petrellis failed to examine a substantial number of records regarding Eazor that ACI had received from TUI. As Petrellis's testimony was the only evidence offered to prove lack of notice, we conclude that the question whether ACI received timely notice of Brooks's claim is best left to the trier of fact.

Indeed, any other outcome would condone ACI's failure to maintain competent records, a policy outcome directly at odds with *Brakeman's* determination that lack of notice is an affirmative defense to be plead and proved by the insurer. As discussed *supra*, Petrellis could not state with certainty that ACI had all of TUI's records relating to Eazor,

nor could she rule out the possibility that ACI had been in contact with North Star regarding Brooks's claim. But ACI's recordkeeping incompetence goes far beyond those deficiencies, for ACI was unable even to produce a copy of its policy with Eazor, forcing litigation to proceed using a form policy which only presumably is similar to the actual policy at issue. Likewise, although ACI insists that TUI was not authorized to receive notice, it was unable to produce the documents governing its relationship with TUI, and the record contains evidence to the contrary — at least one document, for example, is signed by a TUI employee on paper bearing the notation "The Underwriters Inc. . . For American Centennial Insurance Company." (A374.)

Because we are satisfied that ACI's records are insufficient to rule out the possibility that ACI received timely notice of Brooks's claim, we will reverse the District Court's grant of summary judgment for ACI and remand to the District Court for further proceedings. These proceedings should, as an initial matter, include an *in limine* hearing to determine the scope of Petrellis's competence to testify, for the record does not suggest that any foundation has been laid for her testimony. Fed. R. Evid. 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Petrellis joined ACI in 1992, long after ACI had issued its last excess policy, and although it is conceivable that she gained expertise regarding such policies by dealing with those that remained in run-off during her tenure, that seems unlikely. She admitted that, *inter alia*, she did not know if ACI had a policy of obtaining copies of underlying insurance policies, (A227), or whether it had a mechanism for communicating with underlying insurers regarding those policies. (A229.) Indeed, nothing in the record suggests that she ever dealt with an excess policy, in which case her competence to testify would be limited to discussing whether ACI's current records indicate notice. That, of course, would be equivalent to asserting a Fed. R. Evid. 803(7) hearsay exception for using business records to prove lack of receipt, a tactic which ACI has not pursued, perhaps understandably given the state of its recordkeeping.

The judgment of the District Court will be reversed, and the case remanded for further proceedings.

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*